# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

RHONDA BRAY,

     Plaintiff,

     v.

RHYTHM MANAGEMENT GROUP, LLC,
RHYTHM MANAGEMENT GROUP, PLLC,
RHYTHM MANAGEMENT GROUP CORP.
and
ALDRICH CAPITAL PARTNERS,

     Defendants.

Civil Action No. TDC-23-3142

## MEMORANDUM OPINION

Plaintiff Rhonda Bray has filed this civil action against Defendants Rhythm Management Group, LLC, Rhythm Management Group, PLLC, and Rhythm Management Group Corp., (collectively, "Rhythm") as well as Defendant Aldrich Capital Partners, in which she asserts claims of sex discrimination, a hostile work environment based on sex, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. Defendants have filed a Motion to Dismiss and Compel Arbitration in which they seek dismissal of the hostile work environment claim and an order requiring that the remaining claims be sent to arbitration. The Motion is fully briefed. Pursuant to the Court's July 18, 2024 Order, ECF No. 40, Defendants have included in their reply brief a request that the Court strike certain allegations in the Amended Complaint, which the Court construes as a Motion to Strike. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons

set forth below, the Motion to Dismiss and Compel Arbitration and the Motion to Strike will be
DENIED.

## BACKGROUND

Plaintiff Rhonda Bray is the founder and former Chief Executive Officer ("CEO") of
Rhythm Management Group, LLC, a company that provides remote cardiac monitoring services
through the use of data emitted from an implanted device, software through which the data can be
accessed, and interpretation of the data. In 2021, Bray sold a controlling interest in Rhythm
Management Group, LLC and a related company, Rhythm Management Group, PLLC, to Aldrich
Capital Partners ("Aldrich"), which then established Rhythm Management Group Corp. Although
Bray remained the CEO of Rhythm, she became an employee of Rhythm and Aldrich, and Mirza
Baig, an Aldrich managing partner, became Rhythm's Executive Chairman and Bray's direct
supervisor. On or about May 14, 2021, Bray entered into an executive employment agreement
that contained an arbitration clause that stated, in relevant part:

> The parties agree that any dispute between the parties arising out of or relating to
> the negotiation, execution, performance, or termination of this Agreement or the
> Executive's employment, including, but not limited to, any claim arising out of this
> Agreement, claims under Title VII of the Civil Rights Act of 1964, as amended, the
> Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the
> Americans with Disabilities Act of 1990, Section 1981 of the Civil Rights Act of
> 1966, as amended, the Family Medical Leave Act, the Employment Retirement
> Income Security Act of 1974, as amended, and any similar federal, state, or local
> law, statute, regulation, or any common law doctrine, whether that dispute arises
> during or after employment, shall be settled by binding arbitration in accordance
> with the National Rules for the Resolution of Employment Disputes of the
> American Arbitration Association; provided, however, that this dispute resolution
> provision shall not apply to any separate agreements between the parties that do not
> themselves specify arbitration as an exclusive remedy.
>
> * * *
>
> The parties each further agree that the arbitration provisions of this Agreement shall
> provide each party with its exclusive remedy, and each party expressly waives any
> right it might have to seek redress in any other forum, except as otherwise expressly
> provided in this Agreement. **By electing arbitration as the means for final**

**settlement of all claims, the parties hereby waive their respective rights to, and agree not to, sue each other in any action in a federal, state, or local court with respect to such claims, but may seek to enforce in court an arbitration award rendered pursuant to this Agreement. The parties specifically agree to waive their respective rights to a trial by jury, and further agree that no demand, request, or motion will be made for trial by jury.**

Exec. Empl. Agreement § 7.9, Mot. Ex. A, ECF No. 34-2. Bray continued to serve as Rhythm's CEO until her termination on April 28, 2023.

In the Amended Complaint, Bray alleges that, during the time that she was employed by Aldrich, she was subjected to sex discrimination, a hostile work environment on the basis of sex, and retaliation. Generally, Bray alleges that Aldrich did not advance, promote, and retain female employees to the same degree as male employees. For example, Baig directed Bray to fire a female vice president without cause despite her "glowing reviews." Am. Compl. ¶ 20, ECF No. 21. Baig and Aldrich leadership gave promotions, raises, and increased responsibilities to male executives, including Vice President of Engineering Annu Singh, Vice President of Finance Rafael Tarantini, and Director of Administrative Operations Anthony Moultry, while female employees who were equally or better qualified were not promoted.

Bray also alleges that Baig and other Aldrich leaders "were verbally abusive" and fostered a work environment that was "hostile," "toxic," and "derogatory" to Bray and other female employees. *Id.* ¶ 19. According to Bray, Baig used weekly meetings as an opportunity to "humiliate," "belittle," "harass," and "intimidate" Bray and her leadership team to the point where Bray "refused to meet one-on-one with Mr. Baig" because "[s]he felt unsafe." *Id.* ¶ 22.

Moreover, Bray alleges that she was regularly subjected to sexual harassment by Moultry, who repeatedly made inappropriate and sexually charged remarks to and about Bray. On at least nine occasions in less than a year, Moultry subjected Bray to harassing text messages. Often, these text messages commented on Bray's body and appearance. In one message, Moultry wrote, "After

3

seeing you today, I'm not sure if I like you better in white or black . . ." *Id.* ¶ 24. In other instances, Moultry texted to Bray, "You seem to always be on point, mentally and physically lol," and "It feels almost as good moving up that Rhonda Bray latter as it does looking at Rhonda Bray!!! Lol." *Id.* On another occasion, Moultry texted, "You are looking lethal in all black today Rhonda!! Hair and all!! I need to gather my thoughts back now lol." *Id.* At least one string of text messages was charged with sexual innuendo: "But I like to believe I know what you want and how you want it [emojis omitted]." *Id.*

Moultry's harassment of Bray also occurred in person. Moultry "often shifted his body to adjust his private parts" in full view of Bray and other female employees in such a way that it made them "extremely uncomfortable." *Id.* ¶ 28. When alone with Bray, Moultry commented about how "sexy" her hair was, claimed that he would be "in line" to be Bray's next husband, and made other sexual innuendos, such as that he "could teach [her] a lot, even outside of work." *Id.* ¶ 25. Other employees told Bray that Moultry made lewd and sexually charged comments about Bray in their presence. Bray also became aware that Moultry sexually harassed other female employees, including when he sent a text to Bray reporting that he had apologized to a female employee about such an incident.

As CEO, Bray sought to address the sexual harassment. She required Moultry to participate in sexual harassment training and put Moultry on a performance improvement plan, and when those measures did not cause him to stop, she issued a formal, final warning to Moultry. Bray also reported Moultry's harassment against her and other female employees to Baig and other members of senior leadership. Baig, however, minimized her concerns, told Bray that Moultry was valuable to Rhythm, and "refused to impose any significant disciplinary action on him, including termination." *Id.* ¶ 31. Baig also ignored an anonymous complaint, sent two months

4

after Bray's final warning to Moultry, which was sent to Rhythm's Chief Financial Officer by another female employee who described incidents of sexual harassment against her by Moultry.

In March 2023, with Moultry's sexual harassment having continued, and after Moultry had taken sexual harassment training twice without any impact, Bray again requested that Baig terminate Moultry. Baig declined to do so. He did, however, agree to have a law firm conduct an outside investigation into Moultry. That investigation resulted in a recommendation that Moultry be terminated immediately. On April 13, 2023, the members of the Rhythm Board of Directors, consisting of Bray and three Aldrich executives, voted unanimously to follow that recommendation, but the other Board members then decided, over Bray's objection, to retain Moultry as a consultant. According to Bray, "Aldrich has continued to retain Mr. Moultry at the same level of compensation he had received prior to his termination," and Moultry continues to interact with the other Rhythm female employee who he has harassed. *Id.* ¶ 38.

In that same time frame, in March 2023, Baig told Bray that he wanted to replace her as CEO, but that she could transfer to another position such as Chief Operating Officer or a special advisor. On April 28, 2023, less than two weeks after the Board vote relating to Moultry, Bray was terminated without cause, effective immediately. She was not offered the opportunity to transfer to another position.

In the presently operative Amended Complaint, Bray has alleged the following claims under Title VII in the following numbered counts: (1) sex discrimination; (2) a hostile work environment based on sex; and (3) retaliation.

## DISCUSSION

In its Motion to Dismiss and Compel Arbitration, Defendants make two arguments. First, they argue that Bray's hostile work environment claim must be dismissed pursuant to Federal Rule

5

of Civil Procedure 12(b)(6) because Bray has not alleged sufficient facts to demonstrate that the sexual harassment was "severe or pervasive" or that the harassment can be imputed to Defendants. Second, Defendants argue that the sex discrimination and retaliation claims are subject to the arbitration cause and thus may not proceed in this Court. In its request to strike certain allegations in the Amended Complaint, which the Court treats as a Motion to Strike pursuant to Federal Rule of Civil Procedure 12(f), Defendants ask the Court to strike references in the Amended Complaint to an anonymous report of sexual harassment by Moultry that was submitted by another employee.

## I.    Hostile Work Environment

Defendants first seek dismissal pursuant to Rule 12(b)(6) of the Title VII claim alleged in Count 2, a claim of a hostile work environment based on sex, on the grounds that the allegations fail to state a plausible claim for relief. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Under Title VII, a hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A plaintiff asserting a hostile work environment claim

6

must allege facts that plausibly support inferences that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, national origin, religion, or sex; (3) the conduct was sufficiently severe or pervasive to create a hostile or abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022).

Here, there is no dispute that Bray, who complained about the harassment to Baig, has alleged "unwelcome conduct" sufficient to establish the first element of a hostile work environment. *See Strothers v. City of Laurel*, 895 F.3d 317, 328–29 (4th Cir. 2018) (stating that this prong "is not a high hurdle" and can be established by an employee's voicing of an "objection to the alleged harasser or to the employer"). Nor is there any serious dispute that the conduct was based on sex. Rather, Defendants argue that Bray has not alleged sufficient facts to show that the harassment was sufficiently severe or pervasive to establish an abusive atmosphere and that liability may be imputed to Defendants.

### A.    Severe or Pervasive

Defendants assert that Bray's allegations do not describe conduct sufficiently "severe or pervasive" to alter the conditions of her employment and "create an abusive or hostile atmosphere." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). This element has both subjective and objective components. *Id.* As to the subjective component, the plaintiff must have subjectively perceived the environment to be hostile or abusive. *Id.* Where Bray has asserted that she repeatedly notified Aldrich leadership of Moultry's harassment and sought corrective action, she has satisfied this subjective requirement. *See id.* at 176 (finding that a plaintiff's emotional distress and complaints to supervisors met the subjective component).

7

In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)); *see Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 304 (4th Cir. 2019). No "single factor is dispositive" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (citations omitted).

Bray's allegations meet this standard. Bray recounts a series of incidents of sexual harassment by Moultry, who repeatedly made unwelcome and sexually suggestive comments and innuendos about Bray and her appearance. These comments were made directly to Bray in person and via text message, and they were also made to Bray's colleagues. Bray also alleges that Moultry inappropriately touched and adjusted his private parts in front of her. Notably, Moultry's harassment also extended to other women in the office, which is a relevant consideration in a hostile work environment inquiry. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (finding that conduct directed at persons other than the plaintiff may be considered in hostile work environment claims). Particularly where a "work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances," Moultry's conduct, taken together, was sufficiently pervasive to create an abusive atmosphere. *See EEOC v. R&R Ventures*, 244 F.3d 334, 340 (4th Cir. 2001) (denying summary judgment on a hostile work environment claim where a supervisor repeatedly made inappropriate remarks about his sex life and other workers' bodies); *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 205, 209–10 (4th

8

Cir. 2014) (denying summary judgment on a hostile work environment claim where co-workers made repeated, inappropriate sex-based comments); *cf. Jennings v. Univ. of North Carolina*, 482 F.3d 686, 696–97 (4th Cir. 2007) (en banc) (holding under a parallel standard for a hostile environment under Title IX of the Education Amendments of 1972 that a soccer coach's repeated inquiries into players' sex lives and comments on their bodies were sufficiently severe or pervasive to preclude summary judgment).

Beyond the harassment by Moultry, Bray also faced weekly incidents of hostility by her supervisor, Baig. Bray alleges that this hostility is based on sex because she did not see Baig engage in such hostile and derogatory conduct toward men, and she has alleged facts demonstrating that this conduct unreasonably interfered with her work performance, as she has asserted that she stopped meeting with her supervisor alone out of fear for her safety. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (finding that genuine issues of material fact existed as to whether a supervisor's ongoing harassment, which consisted of repeated intimidating, belittling, and maliciously demeaning remarks based on the plaintiff's gender, was sufficiently severe or pervasive to create a hostile work environment). Baig's conduct, when considered along with Moultry's sexual harassment, bolsters the Court's conclusion that Bray has sufficiently alleged severe or pervasive harassment establishing an abusive atmosphere.

### B.    Imputable to the Employer

Defendants also argue that the allegations in the Amended Complaint are insufficient to support a conclusion that the harassment was imputable to the employer. Under Title VII, when the harasser is a supervisor, the employer is strictly liable if the supervisor's actions culminated in a tangible employment action such as termination. *Strothers*, 895 F.3d at 333 n.6 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 429–30 (2013)). A supervisor is someone empowered to "effect a

significant change in employment status," such as firing, failing to promote, or "a decision causing a significant change in benefits." *Id.* at 333 (quoting *Vance*, 570 U.S. at 431). Liability may also be imputed to an employer in cases where the harasser is the victim's co-worker if the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc).

Where Baig was Bray's direct supervisor and made the decision to terminate her employment, his conduct is clearly imputable to Defendants. *See Strothers*, 895 F.3d at 333. As for the harassment by Moultry, although he was either a co-worker or subordinate of Bray, she has alleged that she reported the harassment to Baig and requested that Moultry be terminated, but Baig minimized her concerns and refused to take action, instead emphasizing Moultry's value to Rhythm. When the harassment continued, she again reported it and asked Baig to terminate Moultry, but he again declined. Though Baig arranged for an outside investigation, when that investigation resulted in a recommendation that Moultry be fired, Defendants nevertheless retained Moultry as a consultant and left him in a position to continue harassing female employees. Where Bray has plainly alleged that Defendants and Baig were specifically made aware of Moultry's sexual harassment on multiple occasions and failed to take appropriate corrective action, the Court finds that she has sufficiently alleged facts demonstrating that the sexual harassment is imputable to Defendants. *See Ocheltree*, 335 F.3d at 333–34.

Where, as discussed above, the facts in the Amended Complaint relating to sexual harassment are sufficient to allege plausibly each of the elements of a claim of a hostile work environment based on sex, the Motion will be denied to the extent that it seeks dismissal of the hostile work environment claim in Count 2.

## II.   Motion to Compel Arbitration

In the Motion, Defendants argue that regardless of whether the Court finds that the hostile work environment claim may proceed, it should send the remaining claims of sex discrimination and retaliation to arbitration pursuant to the arbitration clause in Bray's executive employment agreement.  As referenced above, that provision requires that "any dispute between the parties arising out of or relating to the negotiation, execution, performance, or termination of this Agreement or the Executive's employment, including, but not limited to . . . claims under Title VII of the Civil Rights Act of 1964, . . . shall be settled by binding arbitration."  Exec. Empl. Agreement § 7.9.  There is no dispute that this arbitration clause applies to the claims in this case and is enforceable.  Rather, the issue is whether the recently enacted Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), 9 U.S.C. §§ 401–402, which undisputedly allows Bray to decline to arbitrate a sexual harassment dispute such as her hostile work environment claim, also permits her to decline to arbitrate the remaining two claims.

### A.   Legal Standards

Defendants' request to compel arbitration is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14, which provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ."  *Id.* § 2.  Thus, a litigant in federal court may compel arbitration under the FAA upon a demonstration of:  (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision that purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the

11

agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the dispute. *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

For disputes that involve "multiple claims, some arbitrable and some not," courts generally may not "issue a blanket refusal to compel arbitration" if "some of the claims could be resolved by the court without arbitration." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) (per curiam). Rather, the FAA typically requires that the claims be severed, "even if this will lead to piecemeal litigation." *Id.* However, this mandate can be "overridden by a contrary congressional command." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

The EFAA, enacted in 2022, amends the FAA to provide that:

Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault or sexual harassment dispute.

9 U.S.C. § 402(a). The statute defines "sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." *Id.* § 401(4). The decision on whether the EFAA applies to certain claims is to be made by a court, not an arbitrator. *Id.* § 402(b).

**B.      Applicability of the EFAA**

There is no dispute that the requirements of the FAA are generally satisfied in this case. Although Defendants do not dispute that Bray's hostile work environment claim is a claim alleging a sexual harassment dispute within the meaning of the EFAA and thus did not have to be sent to arbitration, they argue that the remaining sex discrimination and retaliation claims must be severed and sent to arbitration.

12

The issue of whether the EFAA overrides the general rule that claims that are subject to arbitration should be severed from those that are not is a matter of statutory interpretation that has yet to be decided by the United States Court of Appeals for the Fourth Circuit or the other United States Courts of Appeals. For questions of statutory interpretation, a court must examine "the literal and plain language of the statute" and, absent a contrary statement of legislative intent, construe the statute "according to its plain and ordinary meaning." *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996). Here, in the language stating that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault or sexual harassment dispute," the critical language is "with respect to a case." 9 U.S.C. § 402(a). Rather than stating that an arbitration agreement is not enforceable with respect to a "claim" relating to a sexual harassment dispute, the EFAA more broadly bars enforcement with respect to a "case." *Id.*

In *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535 (S.D.N.Y. 2023), in which the plaintiff had filed a civil case in federal court with numerous claims alongside a hostile work environment claim based on sexual harassment, including claims of race discrimination, pay discrimination, and sex discrimination, the court focused on this distinction in finding that the EFAA rendered the arbitration agreement unenforceable as to the additional claims. *Id.* at 539–40, 562. Specifically, the court noted that the term "case" is defined as "a civil or criminal proceeding, action, suit, or controversy at law or in equity," while the term "claim" is defined as "the assertion of an existing right; any right to payment or to an equitable remedy." *Id.* at 558–59 (quoting Black's Law Dictionary (11th ed. 2019)). Based on these and other definitions, the court concluded that "case" refers to "an overall legal proceeding filed in a court," while "claim" refers to "a specific assertable or asserted right within such a proceeding." *Id.* at 559. The court also reasoned that elsewhere in

13

the EFAA, Congress used the term "claim," thereby illustrating that Congress was aware of the difference and "thus can be presumed to have been sensitive to the distinct meanings of the terms 'case' and 'claim.'" *Id.* at 559–60 (citing *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 161 (2018)). The court also found significant Congress's decision to enact the EFAA as an amendment to the FAA, which signaled an intent, in the context of sexual harassment, to override the general presumption under the FAA that arbitrable and non-arbitrable claims should be severed. *Id.* at 560. Based on this analysis, the court concluded that "the text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in the case that themselves either allege such harassment or relate to a sexual harassment dispute." *Id.* at 559.

Numerous federal district courts have agreed with this analysis and have likewise held that the EFAA applies to an entire case, not just a sexual harassment claim within a case. *See, e.g.*, *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 925 (N.D. Cal. 2023) ("*Johnson v. Everyrealm* is persuasive concerning its statutory interpretation of the EFAA and its result."); *Williams v. Mastronardi Produce, Ltd.*, No. 23-13302, 2024 WL 3908718, at *1 (E.D. Mich. Aug. 22, 2024) ("This Court shall follow the current majority view, that is based upon the statute's express language, and rules that the EFAA precludes arbitration of this whole case."); *Molchanoff v. SOLV Energy, LLC*, No. 23cv653-LL-DEB, 2024 WL 899384, at *4 (S.D. Cal. Mar. 1, 2024); *Watson v. Blaze Media LLC*, No. 23-CV-0279-B, 2023 WL 5004144, at *3 n.1 (N.D. Tex. Aug. 3, 2023).

The *Johnson* court's analysis of the EFAA's plain and ordinary meaning is both comprehensive and persuasive. In particular, this Court agrees that Congress would not have used the term "case," and instead would have used the term "claim," had it intended to limit the EFAA's reach to sexual harassment claims only and to require severance and arbitration of other claims

within the same case. *Johnson*, 657 F. Supp. 3d at 559. Thus, the Court finds that the language of the EFAA establishes that Congress intended to bar enforcement of an arbitration clause over all claims within a civil action when the case in some way "relates to" a sexual harassment dispute. 9 U.S.C. § 402(a).

In so ruling, the Court rejects Defendants' claim that the Court must subject the remaining claims to an analysis of whether they are sufficiently related to the sexual harassment claim, factually or legally, to be covered by the EFAA. The EFAA imposes no such requirement. In any event, here, Bray's sex discrimination claim and retaliation claim are closely connected to her hostile work environment claim in that the sex discrimination is based on the same sex-based animus that underlay the failure to address adequately her complaints about sexual harassment, and her retaliation claim is based on her allegation that her termination was a form of retaliation for her complaints about sexual harassment.

Although Defendants cite to two unpublished decisions from this District, those cases did not directly address the issue presented here and thus do not alter this Court's conclusion. In *Potts v. Excalibur Associates*, No. 22-cv-02565-PX, 2023 WL 3251410 (D. Md. May 3, 2023), the plaintiff, who had asserted claims for unpaid wages under federal and state law, argued that an arbitration clause was unenforceable because it violated not the EFAA, but a Maryland statute similar to the EFAA that prohibits mandatory arbitration for sexual harassment claims. *Id.* at *3 (citing Md. Code Ann., Lab. & Empl. § 3–715(a) (West Supp. 2023)). Although the court also referenced the EFAA, where the plaintiff had asserted no claims involving sexual harassment, it had no occasion to consider the term "case" in the specific statutory language of the EFAA or to otherwise address the question at issue here. *Id.* In *Randolph v. RRR Bowie, LLC*, No. 22-cv-2150-PX, 2023 WL 7110516 (D. Md. Oct. 27, 2023), the plaintiff's claims of sexual harassment

15

and other misconduct arose before the enactment of the EFAA, so the plaintiff invoked both the EFAA and the similar Maryland statute only as part of an argument that the arbitration agreement at issue was substantively unconscionable. *Id.* at *2, *4. In rejecting that argument, the court generally noted that the substantive unconscionability argument would not apply to the claims alleged in the complaint other than the sexual harassment claim, but it did not consider the term "case" in the statutory language of the EFAA and instead quoted only from the Maryland statute, which renders an arbitration clause unenforceable as to "a claim" relating to sexual harassment. *Id.* at *3 (quoting Md. Code Ann., Lab. & Empl. § 3–715(a)).

Defendants' reliance on *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563 (S.D.N.Y. 2023), is also misplaced. In that case, the court, upon finding that the sexual harassment claim was subject to dismissal under Rule 12(b)(6), held that the EFAA no longer applied and that the remaining claims were subject to arbitration. *Id.* at 588. Here, the Court has found that Bray's hostile work environment claim may proceed, *see supra* part I, so *Yost* is inapplicable. In so finding, the Court need not, and does not, decide the propriety of the procedure applied in *Yost* of subjecting the sexual harassment claim to Rule 12(b)(6) analysis and then, if the claim is dismissed, sending the remaining claims to arbitration.

The Court therefore finds that the EFAA bars the enforcement of the arbitration agreement as to Bray's entire "case," including the sex discrimination and retaliation claims. 9 U.S.C. § 402(a). The Motion to Compel Arbitration will therefore be denied.

## III.   Motion to Strike

In the Motion to Strike, Defendants ask the Court to strike references in the Amended Complaint to an anonymous report of sexual harassment perpetrated by Moultry that was submitted by another female employee. Federal Rule of Civil Procedure 12(f) provides, in part:

16

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see, e.g.*, *Haley Paint Co. v. E.I. du Pont de Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012). In determining whether to grant a motion to strike, the court "enjoys wide discretion . . . in order to minimize delay, prejudice and confusion by narrowing the issues for discovery and trial." *Id*. at 336. Rule 12(f) motions are generally disfavored because striking a portion of a pleading is a drastic remedy and is often sought by the movant simply as a dilatory tactic. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

Defendants characterize the anonymous complaint as unrelated to the claims in this case and as "fabricated" and known "to be readily false." Reply at 6–7, ECF No. 43. In support of their argument, they provide an affidavit from Tarantini, the Vice President of Finance, in which he asserts that Bray encouraged the individual to submit the anonymous complaint even though that employee was reluctant to do so because she did not personally consider Moultry's conduct toward her to amount to sexual harassment, and she did not want him to lose his job.

The allegation that there was an anonymous complaint that Moultry engaged in inappropriate conduct toward another female employee is relevant to the Court's consideration of the hostile work environment claim in Count 2 because harassment of other employees may be considered in assessing whether the conduct was severe or pervasive. *See Spriggs*, 242 F.3d at 184. Where this complaint was submitted to management and thus provided notice of harassment by Moultry, it is also relevant to the issue of whether the harassment is imputable to the employer. *See Ocheltree*, 335 F.3d at 333–34.

As for the claim that the allegation should be stricken because the employee was reluctant to submit the complaint and did so only after Bray encouraged her to do so, it is entirely

17

inappropriate for the Court to make factual determinations on the validity of allegations in a complaint at this early stage, based only on an affidavit submitted by one party and before any discovery has occurred, and it declines to do so now.  Further, even if the Court were to consider the affidavit, it does not establish that the relevant allegations in the Amended Complaint were necessarily false.  Although the affidavit claims that the employee was reluctant to submit a complaint and did so only at Bray's urging, it does not state or otherwise establish that the contents of the complaint were false.  The claim in the affidavit that the employee had stated that she did not want Moultry to lose his job, and that she did not personally consider the conduct to be sexual harassment, does not demonstrate that the facts provided in the anonymous complaint were false, particularly where the affidavit acknowledges that the employee had stated that Moultry had made "some inappropriate comments and had engaged in some actions that may have been inappropriate," but that she "could handle it."  Tarantini Aff. ¶¶ 19, 23, Reply Ex. 1, ECF No. 43-1.  The Court therefore finds no basis to strike the allegations at issue. *See* Fed. R. Civ. P. 12(f). The Motion to Strike will be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and Compel Arbitration and Defendants' Motion to Strike will both be DENIED.  A separate Order shall issue.

Date:   September 24, 2024

THEODORE D. CHUANG
United States District Judge